## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

_____

CHARLES DOWD,                                      Civil Action No.:  17-cv-08924

                          Plaintiff,               **AMENDED COMPLAINT AND**
                                                   **DEMAND FOR JURY TRIAL**

        -against-

DAREN DEMARCO, individually, and in his capacity
as an officer of the New York City Police
Department, KURT WEBER, individually,
and in his capacity as an officer of the New
York City Police Department, JOSEPH
DIBARTOLOMEO, individually, and in his
capacity as an officer of the New York City Police
Department, JOSEPH REZNICK, individually
and in his capacity as an officer of the  New
York City Police Department, and JOHN DOES
of the New York City Police Department, the identity and
number of whom is presently unknown,

                          Defendants.

_____

        Charles F. Dowd, by this amended complaint, seeks redress from certain officers of the

New York City Police Department ("NYPD").  At all relevant times herein, Defendants Daren

DeMarco, Kurt Weber, Joseph DiBartolomeo and Joseph Reznick (collectively, "Defendants" or

"Conspirators") were police officers in the NYPD Internal Affairs Bureau ("IAB").  Defendants,

in their official capacity, acting under color of law with others known and unknown, conspired to

frame and did frame Charles Dowd ("Chief Dowd" or "Plaintiff") by charging him with

violations of law in which they knew or should have known he did not engage.   Defendants

compelled Chief Dowd to appear at a hearing to defend himself against those charges, and

deprived him of the money he had to spend to defend himself, in the face of evidence in

possession of the NYPD, to which Defendants had full access, that Chief Dowd was innocent of

the charged conduct.  In seeking damages and equitable relief against Defendants, Chief Dowd alleges as follows:

1.     The Defendants deprived Chief Dowd of his constitutional rights to due process of law by intentionally and maliciously bringing false charges against him while acting under the color of law.  They agreed to and did charge him with engaging in seven criminal acts for which there was legally insufficient evidence to establish guilt, or irrefutable evidence in their own NYPD files of his innocence. As part of the conspiracy and in furtherance thereof, the Conspirators ignored evidence of Chief Dowd's innocence and declined to speak with him before filing charges against him, thereby causing him to be charged with unlawful conduct, hauling him before a tribunal, and depriving him of money he had to expend to defend himself. Defendants knew Chief Dowd would be out of pocket regardless of if he succeeded in defending the charges: money would have to be spent on hiring an attorney, paying a fine, or both.

2.     Specifically, the Conspirators caused Chief Dowd to be charged with accepting meals and entertainment from Black Box Network Services ("Black Box"), a company doing business with the NYPD.  The Conspirators charged Chief Dowd with accepting meals on five occasions, attending a baseball game as the company's guest, and attending a golf outing as the company's guest – all on specified days – without establishing that he was actually present for those meals or events.  He was not.  NYPD documents to which the Defendants had full access, and which, in fact, they were supposed to check, irrefutably established that Chief Dowd was not present for several of the events – and therefore was innocent of the charges.  The Conspirators filed the criminal charges anyway.  They did this maliciously, intending to humiliate and embarrass Chief Dowd, making him appearing court to defend himself, and depriving him of money whether he won or lost.

2

3.      Before charges were filed, when Chief Dowd learned that he was under investigation, he asked to speak with his boss, the Police Commissioner. Chief Dowd's requests to speak with the Police Commissioner about the charges were denied twice, depriving him the meaningful opportunity to be heard.  During this time, Conspirators leaked stories to the press, suggesting that Chief Dowd would be charged although the Conspirators possessed evidence that Chief Dowd was not guilty.  Only after Chief Dowd retired from the NYPD were charges brought against him, foreclosing the option of an internal Police Department hearing and necessitating that he spend enormous amounts of money in legal fees for his defense. Defendants' actions were calculated and conceived in malice to inflict the most harm to Chief Dowd.

4.      Ultimately, Chief Dowd was acquitted following a hearing as the judge and even the prosecutors recommended dismissal of all charges based on their lack of merit.  But the Conspirators did not purge the internal charges from Chief Dowd's NYPD file even though those charges were initially unsupported and subsequently disproved.

## JURISDICTION AND VENUE

5.      This case arises under the United States Constitution and 42 U.S.C. § 1983, as amended, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

6.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

7.      This Court is the appropriate venue pursuant to 28 U.S.C § 1391.

## PARTIES

8.      Charles F. "Chuck" Dowd, a native New Yorker, built his life around being a police officer.  He joined the NYPD after his father served 34 years as a police officer; he,

himself, served as police officer also for 34 years.  Chief Dowd married a colleague who herself served in the police department for 21 years, retiring after September 11, 2001.

9.     Chief Dowd rose to the rank of Assistant Chief, dealing with information technology and communications.  His rank placed him the top forty officers of the hierarchy of the NYPD, an agency of 50,000 members, before he retired in May 2014. In addition to his regular duties, as part of his work for the Police Department Chief Dowd, with the approval of the then-Commissioner, spent years lobbying Congress to establish the First Responders Network Authority dealing with telephonic and radio communications.  In those roles, Chief Dowd made decisions affecting various communications companies, including Motorola.

10.     Defendant Daren DeMarco, at all relevant times, was a Sergeant in the Internal Affairs Bureau of the NYPD, sworn to uphold the law and charged with preserving the integrity of the Police Department.   As part of that, Sergeant DeMarco was charged with bringing actions against police officers alleged to have engaged in misconduct, and was supposed to do so honestly.  Sergeant DeMarco is the individual on which the entire investigation into Chief Dowd pivoted.  He is sued for damages in his individual capacity and in his official capacity.

11.     Defendant Kurt Weber, at all relevant times, was a Lieutenant in the Internal Affairs Bureau of the NYPD, sworn to uphold the law and charged with preserving the integrity of the Police Department.  As part of that, Lieutenant Weber was charged with bringing actions against police officers alleged to have engaged in misconduct, and was supposed to do so honestly.  Lieutenant Weber supervised Defendant DeMarco's work, which included reviewing the charges filed against Chief Dowd.  He is sued for damages in his individual capacity and in his official capacity.

12.     Joseph DiBartolomeo, at all relevant times, was a Deputy Inspector in the Internal Affairs Bureau of the NYPD, sworn to uphold the law and charged with preserving the integrity of the Police Department.  As part of that, Deputy Inspect DiBartolomeo was charged with bringing actions against police officers alleged to have engaged in misconduct, and was supposed to do so honestly.  Deputy Inspector DiBartolomeo, at relevant times, supervised the work of Lieutenant Weber, which included reviewing the charges filed against Chief Dowd.   He is sued for damages in his individual capacity and in his official capacity.

13.     Joseph Reznick, at all relevant times, was a Deputy Commissioner of Internal Affairs of the NYPD, sworn to uphold the law and charged with preserving the integrity of the Police Department.  As part of that, Deputy Commissioner Reznick was charged with bringing actions against police officers alleged to have engaged in misconduct, and was supposed to do so honestly.  He supervised the work of Deputy Inspector DiBartolomeo and approved the filing of charges against Chief Dowd.  He is sued for damages in his individual capacity and in his official capacity.

14.     Defendants John Does, the co-conspirators of DeMarco, Weber, DiBartolomeo, and Reznick were, at all relevant times, police officers and employees of Defendant City of New York, the identity and number of whom are presently unknown.

15.     At all relevant times, the Conspirators were aware that the Police Commissioner, who had been a shareholder and director of a company affected by Chief Dowd's decisions over the years, had no affection for him.

## FACTUAL ALLEGATIONS

A.    Defendants Falsely Charged Chief Dowd With Acts He Did Not Commit

16.    The Conspirators agreed to and did engage in a course of conduct conceived in malice, by falsely asserting that Chief Dowd, while serving as a public official, criminally accepted gifts from Black Box, a vendor doing business with the NYPD.   The Conspirators were provided documents with handwriting on them by which documents two Blackbox salesmen sought reimbursement for expenses.  The Conspirators asserted, from Chief Dowd's name appearing on those documents, both that he must have been present for the meals for which reimbursement was sought, and that he must not have paid his fair share of the bill.  However, the Conspirators did not speak with Chief Dowd. The Conspirators did not speak with either of the salesmen seeking reimbursement. The Conspirators did not speak with the people who wrote on the documents. The Conspirators did not verify Chief Dowds's location, as they could have. Yet Defendants represented that they conducted an investigation.

17.    With assurance that the Commissioner had no affection for Chief Dowd, the Conspirators asserted that the documents they were given constitute proof that Chief Dowd engaged in criminal conduct.  Yet throughout the relevant period, the NYPD possessed records proving the Defendant Conspirators' charges to be untrue.  The Defendants either knew that fact—if they checked their own files—or did not even examine their own department's records before they charged a 34-year veteran of the NYPD with criminal conduct.

18.    Before filing the charges, in the course of the conspiracy, and as a part thereof, the Conspirators leaked Chief Dowd's name to the press as being involved in a criminal investigation.  In April 2014, stories were leaked to major newspapers with photos of Chief Dowd and his home. The articles did not concern Chief Dowd.  Rather, they reported on

violations by two of Chief Dowd's subordinates, thereby, through use of strategically placed pictures, suggesting Chief Dowd's guilt for his colleagues' acts. Chief Dowd's reputation and career were harmed with no legitimate law enforcement purpose.

19.    Thereafter, the Conspirators caused unsupported charges to be filed in Chief Dowd's permanent NYPD file to ensure maximum damage to Chief Dowd's liberty, finances, reputation, and career. In March 2014, Defendants began to "investigate" Chief Dowd in relation to those charges. When he learned of the investigation, Chief Dowd sought an audience with the Police Commissioner. He did not get one. When Chief Dowd attempted an audience with the Police Commissioner a second time, he again did not get one. Chief Dowd filed for retirement on May 1, 2014, after he was denied the opportunity to be heard. Had IAB wanted to bring charges, they could have done so within 30 days of Chief Dowd's filed for retirement. Instead, they waited until August 2014—over three months after Chief Dowd retired—to bring Departmental charges. Because Chief Dowd was no longer with the Police Department, he had no way of challenging them.

20.    The Departmental charges filed against Chief Dowd in August 2014 are devoid of any specifics: they do not speak to the purported violation committed. The substance of the charge is that at some unidentified point during a four-year period Chief Dowd violated a rule. Because he retired, Chief Dowd is forbidden from challenging that charge, and the Police Department records still reflect that there are charges pending against him.

21.    Having defiled Chief Dowd's Police Department record, without providing Chief Dowd an opportunity to be heard, even when he requested an audience with the Police Commissioner, and without checking evidence in their possession to determine whether he was guilty of the crimes or violations of the rules, DeMarco, as primary investigator in the matter,

Weber as his immediate supervisor, and their co-Conspirators, maliciously created a case against

Chief Dowd charging that he accepted from Black Box:

        a.     Lunch on July 1, 2010 at Wolfgang's Steakhouse
        b.     Attendance at a golf outing on Long Island on June 22, 2011
        c.     Attendance at a New York Yankees home game on August 9, 2011
        d.     Lunch on November 7, 2012 at Angelo's of Mulberry Street
        e.     Lunch on February 1, 2013 at Angelo's of Mulberry Street[1]
        f.     Lunch on February 8, 2013 at Angelo's of Mulberry Street
        g.     Lunch on March 16, 2013 at Angelo's of Mulberry Street

     22.    The Conspirators knew that in order to establish probable cause, they needed

evidence to prove that Chief Dowd attended these meals and events, and that he did not pay his

fair share of the bill.  They had neither.  The Conspirators knew, before they even filed the

charges, they were not in possession of any such evidence, and knew or recklessly chose not to

learn of Chief Dowd's whereabouts on the days of the charged meals or events.  The reality is

that DeMarco, Weber, DiBartolomeo, Reznick, and their co-Conspirators brought the charges

against Chief Dowd knowing the harmful consequences to him.  Defendants brought these

charges maliciously, because they were determined to humiliate Chief Dowd, harm his future

employment prospects, compel him to take time to defend himself, and cause him to spend

enormous amounts of money in legal fees to defend against the charges or to pay fines, thereby

depriving him of property. Neither the lack of legally sufficient evidence nor the fact that the

charges were irrefutably false stayed their malicious prosecution.

     23.    The Conspirators forwarded these charges to the New York Conflict of Interest

Board ("COIB"), as though they conducted an adequate investigation.  In January 2015, the

COIB served on Chief Dowd a Notice of Initial Determination of Probable Cause (the "Probable

Cause Notice").  In it, the COIB informed Chief Dowd that they had "made an initial

---

[1] The initial date was based on an erroneous reading of an American Express bill. The charge was amended to January 31, 2013, the date of occurrence according to the bill, shortly before trial.

determination . . . that there is probable cause" Chief Dowd violated the New York City Charter

pursuant to the facts compiled in the NYPD's so-called investigation.  The Probable Cause

Notice provided Chief Dowd twenty days to respond to the COIB's allegations.

24.     Pursuant to COIB Rule § 2-02, failure to respond to the Probable Cause Notice

would result in COIB commencing a hearing at the New York City Office of Administrative

Trials and Hearings ("OATH") to determine if Chief Dowd violated the New York City Charter

and thereby committed a crime.  Any such violation would result in Chief Dowd being found

guilty of a misdemeanor. Chief Dowd was therefore compelled to respond to the COIB's petition

lest he be found guilty of a crime he did not commit, based on an wholly inadequate

investigation in which his request to speak about it was denied.

25.     In July 2015, the COIB served its first Notice of Petition indicating, again, that

probable cause existed to determine that Chief Dowd violated the New York City Charter.  The

Notice of Petition provided Chief Dowd thirteen days to respond to the COIB's allegations.

26.     Pursuant to COIB Rule § 2-02(c)(3), a failure to answer or respond to the

allegations in the Notice of Petition would deem each allegation admitted.  Consequently, if

Chief Dowd failed to respond, he would found guilty of a misdemeanor.  He was therefore

compelled to answer the Notice of Petition and appear by counsel lest he be found guilty of a

crime he did not commit, based on a wholly inadequate investigation.

27.     All of the seven charges the Conspirators caused to be brought against Chief

Dowd were false.  For each, the Conspirators failed to show that Chief Dowd was present for the

event or meal, or that Chief Dowd failed to pay his fair share of the bill.  For three of the events

and meals—June 22, 2011, August 9, 2011, and January 31, 2013—Chief Dowd was out of state

on NYPD business, and could not possibly have attended, let alone fail to pay his fair share of a

bill..  For two of the meals—November 7, 2012 and February 8, 2013—Chief Dowd was tending to family obligations, and could not possibly have attended, let alone failed to pay his fair share of a bill.  For one of the meals—March 16, 2013—Chief Dowd was marching with the senior members of the Police Department in the Saint Patrick's Day Parade.  He was photographed with date and timestamp on the photograph by the NYPD photography unit marching with the NYPD's Emerald Society during the St. Patrick's Day Parade; those pictures were in the Police Department file. He is also featured prominently in a YouTube video posted online showing him marching in that same parade making it impossible for him to have attended a Black Box luncheon that day in Little Italy.  And for another meal—July 1, 2010—the Conspirators propounded a bill from a restaurant, but did not even bring forth a  receipt to indicate that the meal was paid for by Black Box,  thus failing to establish that Dowd failed to pay Black Box, the vendor,  his fair share of the meal.  Additionally, although three witnesses testified about the July 1, 2010 bill, none of them placed Chief Dowd at the restaurant for that meal.

28.     Not surprisingly, when Chief Dowd was able to establish that he was not in New York when he allegedly received these gifts, the COIB hearing judge recommended to the COIB that it dismiss the charges because it was apparent that Defendants did not have probable cause to bring the charges. The evidence they relied on did not establish that Chief Dowd accepted the gifts.  Unfortunately, the harm to Chief Dowd had already been done.  He was compelled to spend time on his defense and hire counsel to identify and locate the documentary evidence establishing his alibis.

29.     Additionally, following the investigation, Chief Dowd's retirement, and the filing of charges and subsequent acquittal, Chief Dowd has not obtained full-time employment.

B.     The Conspirators Ignored Exculpatory Evidence and Framed Chief Dowd

30.     DeMarco, the officer who led the investigation of Chief Dowd, reviewed no documents or evidence other than what he was told were Black Box documents.  Throughout the entirety of his investigation, NYPD documents such as duty rosters, time sheets, travel requests and approvals, EZ Pass records, official photographs, and telephone records—which would have disproved the charges against Dowd—were always available to DeMarco and his co-Conspirators.  They knew that Chief Dowd had a department car so that they could track his whereabouts.  They knew that they could check Chief Dowd's cellular device to determine this location.  They either chose not to review these records or suppressed their exculpatory contents.

31.     At the COIB hearing, DeMarco admitted under oath that he did not verify the handwriting on the Black Box documents; that he did not interview the Black Box salesmen who submitted the reimbursement requests; and that he did not interview Chief Dowd.  And although DeMarco testified under oath that he recorded all of the details of his investigation in handwritten notes maintained in his file, the NYPD Legal Bureau in response to a subpoena indicated that no such files existed.

32.     The Conspirators did not even have any Black Box documents relating to the golf game and the Yankees game supporting their allegations for June 22, 2011 and August 9 of the same year. They used hearsay instead, without doing anything to verify it.  Two federal investigators from the United States Attorney's Office for the Southern District of New York ("SDNY") interviewed Chief Dowd.  DeMarco, without being present for that interview, drafted a memorandum reflecting what was said during the interview.  His memorandum stated that Chief Dowd attended an "Apple" golf outing, and a Yankees game.  From those two assertions

Defendants concluded that Chief Dowd attended a golf outing as a guest of Black Box on June 22, 2011 and a Yankees game on August 9, 2011 also as a guest of Black Box, and charged him accordingly.  In fact, the "Apple" was not a computer company. The reference is to the American Association of Professional Law Enforcement, called AAPLE, having nothing to do with a city vendor.  At the time DeMarco drafted his memorandum, Defendants had full access to evidence in their files establishing that Chief Dowd was not even in New York State on the date of these events—he was travelling on NYPD business.  Defendants' subsequent prosecution of Chief Dowd was malicious and designed to compel Chief Dowd to appear at a hearing to defend himself against those charges and deprive him of the money he had to spend to defend himself or to pay fines, in the face of evidence in possession of the NYPD that Chief Dowd was innocent of the charged conduct.

### FIRST CAUSE OF ACTION
MALICIOUS PROSECUTION IN VIOLATION OF
THE FOURTH AND FOURTEENTH AMENDMENTS;
AND 42 U.S.C. § 1983

33.    Plaintiff repeats and realleges each of the foregoing allegations as if fully incorporated herein.

34.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

35.    All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law in their capacity as New York City police officers and their acts or omissions were conducted within the scope of their official duties or employment.

36.     At the time of the complained events, Plaintiff had the clearly established Constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment.  Any reasonable police officer should have known of these rights but the Defendants maliciously prosecuted Plaintiff without probable cause and without due process when they worked in concert to secure false charges against him and to refuse him the opportunity to be heard, which resulted in his unlawful prosecution.  Defendants charged Plaintiff, a 34-year veteran of the NYPD without checking with witnesses, without verifying the documents, without verifying his location, and without speaking to Plaintiff.

37.     Defendants knew that Police Department records reflect when a fellow officer is working.  They knew that they could check Plaintiff's travel records, and they knew they could check his cellular device to monitor his location.  Defendants either checked these records and ignored the information, or never checked the records at all.

38.     Defendants targeted Plaintiff, and charged him improperly based on an inadequate investigation.  Their unlawful actions were willfully performed with malice and the specific intent to deprive Plaintiff of his rights.  Defendants caused Plaintiff to be charged with acts that would result in a misdemeanor conviction when Defendants knew or were reckless in not knowing that they had access to documents that proved their charges were untrue and forwarded those charges to the COIB.  The prosecution of Plaintiff by each Defendant constituted malicious prosecution as there was no basis for Defendants to charge Plaintiff, who was totally acquitted.

39.     These acts deprived Plaintiff of his constitutional and statutory rights and caused him other damages.

40.     Defendants are not entitled to qualified immunity for the conduct complained of, as there was no probable cause to charge and prosecute Plaintiff.

41.     As a direct and proximate result of Defendants' violations of Plaintiff's rights as described herein, Plaintiff has suffered damage to reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of his due process as protected under the Constitution, as well as other compensatory damages, in an amount to be determined at trial.

42.     In addition to compensatory damages, Plaintiff is entitled to punitive damages against each of the named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## SECOND CAUSE OF ACTION
MALICIOUS ABUSE OF PROCESS;
42 U.S.C. § 1983

43.     Plaintiff repeats and realleges the allegations in paragraphs 1-32 as if fully incorporated herein.

44.     Defendants initiated and filed charges in Plaintiff's permanent personal Police Department file over two months after Plaintiff retired, knowing when they were doing so, that Plaintiff would be procedurally barred from defending against those charges.  Defendants did so with no legal justification seeking only to allow those charges to remain in Plaintiff's personal file to harm his future employment prospects.  These charges, which remain in Plaintiff's file, are devoid of any specific facts or specifications regarding his alleged violation except to say that he, during an unidentified four year period violated a rule. The viciousness of filing charges while using procedural rules to keep them from being challenged bespeaks the Conspirators' malice

14

45.     Additionally, Defendants, intending to do harm without excuse or justification, caused the issuance of legal process to compel Plaintiff to appear at the COIB hearing and spend hundreds of thousands of dollars to defend himself against allegations not born of probable cause.  The legal process initiating those charges was defective as Defendants knew they did not have probable cause.

46.     Defendants had no other motive but to humiliate and embarrass Plaintiff, to compel him to defend himself and to smear his reputation, harming his chances of future employment.  Defendants also deprived Plaintiff of property by causing him to either spend money on his legal defense or on a fine.

47.     As a consequence of the Conspirators filing charges in Plaintiff's NYPD personnel file, Plaintiff was unable to procure full-time employment even after his acquittal on the COIB charges.

48.     As a direct and proximate result of Defendants' violations of Plaintiff's rights as described herein, Plaintiff has suffered damage to reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of his due process as protected under the Constitution, as well as other compensatory damages, in an amount to be determined at trial.

49.     In addition to compensatory damages, Plaintiff is entitled to punitive damages against each of the named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## THIRD CAUSE OF ACTION
U.S. CONST. AMEND. V AND 42 U.S.C. § 1983

50.     Plaintiff repeats and realleges the allegations in paragraphs 1-32 as if fully incorporated herein.

15

51.     The Fifth Amendment of the United States Constitution protects against deprivation of life, liberty, and property.  Acting under color of law, Defendants went after Chief Dowd's constitutional right to be free from deprivation of liberty and property without due process of law under the Fifth and Fourteenth Amendments. By their conduct, as described herein, and acting under color of law, Defendants are liable to Plaintiff under 42 U.S.C. § 1983 for the violation of his constitutional right to be free from any deprivation of liberty and property without due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

52.     Defendants targeted Chief Dowd, and charged him falsely with a misdemeanor offense based on an inadequate investigation and false witness testimony.  Their unlawful actions were willfully done with malice and the specific intent to compel Plaintiff to, at best, spend an enormous amount of money to defend against the allegations, or, at worst, spend an enormous amount of money to defend against the allegations and pay monetary penalties.  Defendants caused Plaintiff to be charged with acts that would result in misdemeanor convictions if not defended even though Defendants knew or were reckless in not knowing that they were in possession of documents that proved their charges were untrue.  Knowing that they had not conducted an adequate investigating, and not knowing what Chief Dowd had done or where he was on the dates charged, the Conspirators forwarded the charges to the COIB.

53.     Chief Dowd had a legitimate claim of entitlement to this money, and the Defendants infringed upon this property right by forwarding false misdemeanor charges to the COIB.  Defendants compelled Plaintiff to spend money on his legal defense or on fines that he would have to pay in the absence of a defense.  Defendants also deprived Chief Dowd of his right to liberty interest, which includes the right to engage in employment opportunities.  As a

direct and proximate result of Defendants' actions, Chief Dowd has not obtained full-time employment.

54.      Consequently, Chief Dowd has suffered damage to reputation, humiliation, embarrassment, and deprivation of his liberty and property interests as protected under the Constitution.  In addition to compensatory damages, which he seeks and will be determined at trial, Chief Dowd is entitled to punitive damages against each of the named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 DUE PROCESS
VIOLATION OF THE FOURTEENTH AMENDMENT

55.      Plaintiff repeats and realleges the allegations in paragraphs 1-32 as if fully incorporated herein.

56.      As described above, each Defendants, while acting in aid of each other and pursuant to an agreement with each other and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

57.      Defendants caused the filing of charges against Plaintiff in his permanent personal Police Department file.  When Plaintiff learned of potential charges, he requested to speak to the Police Commissioner on two different occasions and was denied each time.  These charges were filed over two months after Plaintiff retired from the Police Department, foreclosing his opportunity to defend himself against the charges.

58.      Defendants were police officers charged with upholding the law, fully aware that an individual cannot be charged with a crime without evidence.  Defendants nevertheless falsely

represented that they investigated the charges against Plaintiff, that they had evidence—which they did not—and that Plaintiff was guilty of those charges.  Plaintiff was not even present for the events he was accused of attending.

59.     In the manner described more fully above, the Conspirators provided the COIB with inadequate and misleading evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

60.     Defendants' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

61.     As a direct and proximate result of Defendants' violations of Plaintiff's rights as described herein, Plaintiff has suffered damage to reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of his due process as protected under the Constitution, as well as other compensatory damages, in an amount to be determined at trial.

62.     In addition to compensatory damages, Plaintiff is entitled to punitive damages against each of the named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

### FIFTH CAUSE OF ACTION
CONSPIRACY;
U.S. CONST. AMEND. IV, V, XIV AND 42 U.S.C. § 1983

63.     Plaintiff repeats and realleges the allegations in paragraphs 1-32 as if fully incorporated herein.

64.     Defendants, under the color of law, conspired with one another to deprive Plaintiff of his constitutional rights, including his due process rights.

65.     It was part of a conspiracy that Defendants DeMarco, Weber, DiBartolomeo, Reznick, and others known and unknown did, among other acts, bring charges against Plaintiff based on unreliable evidence ultimately supported by false testimony.

66.     As a direct and proximate result of Defendants' violations of Plaintiff's rights as described herein, Plaintiff has suffered damage to reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of his due process as protected under the Constitution, as well as other compensatory damages, in an amount to be determined at trial.

67.     In addition to compensatory damages, Plaintiff is entitled to punitive damages against each of the named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## SIXTH CAUSE OF ACTION
INJUNCTIVE RELIEF

68.     Plaintiff repeats and realleges the allegations in paragraphs 1-32 as if fully incorporated herein.

69.     Defendants failed to remove charges from Plaintiff's personnel file even after a full acquittal in court.

70.     Plaintiff is entitled to a clean NYPD personnel record and in the absence of voluntary removal, Plaintiff seeks relief from this Court in the form of an order to remove the charge.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charles Dowd demands judgment as follows:

A.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

19

B.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

C.      An award for damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

D.      An award of punitive damages; and

E.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorney's fees to the fullest extent permitted by law and any other such relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  New York, New York
        February 12, 2018

                                        BAKER & HOSTETLER LLP

                                        s/ John W. Moscow

                                        John W. Moscow, Esq.
                                        Susrut A. Carpenter, Esq.
                                        Michelle N. Tanney, Esq.
                                        45 Rockefeller Plaza
                                        New York, N.Y. 10111
                                        Phone: (212) 589-4200
                                        Fax: (212) 589-4201
                                        jmoscow@bakerlaw.com
                                        scarpenter@bakerlaw.com
                                        mtanney@bakerlaw.com